IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 23, 2019

## JAMES HOLMES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 13-01976      W. Mark Ward, Judge

_____

## No. W2018-01709-CCA-R3-PC

_____

Petitioner, James Holmes, appeals the denial of his petition for post-conviction relief. Petitioner argues that he was denied effective assistance of counsel because his attorneys failed to adequately prepare for Petitioner's trial and because there was a breakdown in communication between Petitioner and his attorneys. Following a review of the briefs and record, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Ernest J. Beasley, Memphis, Tennessee, for the appellant, James Holmes.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd and Holly Palmer, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

*Background*

Following a jury trial, Petitioner was convicted of first-degree premeditated murder, felony murder during the attempt to perpetrate a robbery, attempted especially aggravated robbery, attempted first degree murder, attempted carjacking, and employing a firearm during the attempt to commit a dangerous felony. He received an effective sentence of life plus twenty-five years. Facts developed at the trial which are pertinent to Petitioner's issues in this appeal are taken from this Court's opinion in the direct appeal.

This case arises from the October 9, 2012 shooting death of Roneccia Luster at an automated teller machine (ATM) and the attempted carjacking and shooting of Charles Ratliff a few minutes later.

At the trial, Memphis Police Department (MPD) Officer Kevin Bobo testified that on October 9, 2012, around 7:00 p.m. he responded to a shots-fired call at Perkins Road and Aloha Avenue. He said that when he arrived at the scene, the Memphis Fire Department had responded to a car crash at the same intersection in front of a McDonald's restaurant and requested his assistance. Officer Bobo stated that a vehicle had crashed into a utility pole and that the pole had been knocked down.

Seven photographs were received as exhibits that depicted the scene of the crash. The photographs showed a red sedan that had collided with a metal utility pole, which had broken in half. The sedan's hood was crumpled, the windshield had shattered, and the driver's side airbag had deployed.

Katrina Foster testified that on October 9, 2012, at 7:00 p.m., she was in the Orion Federal Credit Union parking lot directly behind an ATM using her cell phone with her car windows partially open. Ms. Foster said that a woman in a burgundy or maroon four-door sedan was using the ATM and that she observed two men walking "very, very swiftly" across the parking lot toward the ATM. Ms. Foster stated that one man approached the passenger-side door and the other man approached the driver's side door. Ms. Foster heard a scream and a gunshot, and she said that the sedan "jerked" out of the parking lot into the street, moving until hitting a utility pole in front of McDonald's.

Ms. Foster testified that the two men ran toward McDonald's. She drove away from them, but she circled around and saw people coming out of McDonald's to help the driver of the sedan. Ms. Foster parked her car and waited to speak with the police. Ms. Foster stated that she had been parked behind the ATM for three minutes before the shooting. She said that her car was ten to twelve feet from the ATM, that no other cars were in the parking lot, and that the parking lot lights were off. She stated that it was dusk, but that the light was sufficient to see outside. Ms. Foster stated that the ATM had lights and that she was facing the ATM. Ms. Foster stated that the man standing at the passenger side of the sedan was close to the car but that the man standing at the driver's side was the person who shot the woman.

MPD Officer J.R. Rector testified that on October 9, 2012, he collected evidence at the scene of the shooting. Officer Rector said that he collected a .22-caliber shell casing and a white t-shirt near the ATM. He also collected a brown vest with an electronic device in its pocket in the backyard of a building across the street from the car crash.

Billy McCoy, a fraud prevention officer at Orion Federal Credit Union, testified that he was responsible for maintaining the surveillance cameras at the bank's ATMs. He said that he provided ATM surveillance footage from the time frame of the shooting to the MPD and created still photographs from the video recording.

The video recording was played for the jury. In the recording, a red sedan drove up to the ATM, and a woman wearing a United States Postal Service uniform opened her driver's door and used the keypad. After about one and one-half minutes, a man wearing a grey hooded sweatshirt approached the passenger side of the car, and another man wearing a white vest over a red shirt approached the driver. The woman closed her door, and the man on the driver's side pulled out a gun. As the car began to move, the woman moved away from the gun, putting up her left arm to shield herself, and the man pointed the gun at the woman. The gun fired as the car pulled away. The two men walked in the opposite direction of the car. The timestamp on the recording reflects that no more than one second lapsed between the time the men became visible on the screen and the time the car drove out of the frame. A photograph from the recording depicting the shooter's face was received into evidence.

Angela Marion, [Petitioner's] mother, testified that on October 9, 2012, she saw a news report of a robbery at an ATM. She said she recognized [Petitioner] on the surveillance video. Ms. Marion stated that [Petitioner] called her and told her "that he had messed up," that he shot a young woman during a "robbery gone wrong," and that he did not mean for it to happen. Ms. Marion said she went to the police station the next day, gave a statement, and identified several pictures of [Petitioner] and his friend from the video recording.

. . .

MPD Officer Newton Morgan testified that he processed and took photographs of the interior of the female victim's car. The photographs

- 3 -

showed the victim's work identification card, her wallet and checkbook, a receipt from the ATM at the time of the shooting, and a sweatshirt that was part of the victim's work uniform.

MPD Officer Stacy R. Milligan testified that he was dispatched on October 10, 2012, to photograph a gun possibly used in a crime. Officer Milligan said that he located the gun and photographed it. Officer Milligan said there were six .22-caliber bullets in it and that he had mistakenly recorded seven bullets in his report.

On cross-examination, Officer Milligan testified that the gun, a .22-caliber long rifle, was found inside a fenced backyard. Officer Milligan stated that he placed the bullets in separate envelopes on the day the gun was recovered. Officer Milligan acknowledged that his report listed one bullet in the chamber of the gun and six in the magazine but said five bullets were in the magazine. Officer Milligan stated that it was possible he waited to remove the bullets from the gun until he arrived at the police station

Tennessee Bureau of Investigation (TBI) Special Agent Samantha Spencer, an expert in serology and DNA analysis, testified that she compared dry and wet DNA swabs taken from the gun with saliva swabs taken from the [Petitioner] and the codefendant. She said that swabs taken from the back of the trigger and the handle of the .22-caliber long rifle recovered by Officer Milligan were consistent with [Petitioner's] DNA. Agent Spencer said that [Petitioner's] DNA was present on the wet swab taken from the gun. On cross-examination, Agent Spencer testified that the probability of another person matching the DNA profile from the swabs was one in 322 African-Americans.

TBI Special Agent Cervinia Braswell, an expert in firearms identification analysis and comparison, testified that she analyzed the gun recovered by Officer Milligan and determined that the recovered shell casings had markings matching the test bullets, indicating that they were fired from the same gun. She stated that the bullet taken from the female victim's body had some identifying markings consistent with being fired from the gun recovered by Officer Milligan but that there were not enough markings to conclude with certainty that it came from the gun. Agent Braswell stated that a semiautomatic gun chambered a new bullet automatically when fired. Agent Braswell said the gun's magazine held ten rounds, plus one in the chamber, for a total of eleven. She said she received four cartridge casings, one bullet, two lead fragments, one plastic fragment, and six live rounds.

. . .

The codefendant, Bishardo Higgs, testified that he and [Petitioner] had been friends since high school and that they often spent time together. He said that on October 9, 2012, he and [Petitioner] walked to Ten Mile Creek apartment complex in order to smoke marijuana and to spend time with women. The codefendant stated that [Petitioner] wanted to walk to McDonald's and that when they arrived, [Petitioner] smiled and said, "Look." The codefendant stated that he thought [Petitioner] had seen someone they knew because he was smiling. The codefendant said [Petitioner] walked toward a car.

The codefendant testified that when they were closer to the car, [Petitioner] said, "Watch this," pulled out a gun, ran to the car, and told the driver to get out. The codefendant said that the woman pushed the gas pedal and [Petitioner] shot her. The codefendant stated that he did not remember walking away with [Petitioner] because he was shocked and that he and [Petitioner] watched the car as it drove away. The codefendant said that [Petitioner] repeatedly stated, "I shot the seat" and that [Petitioner] appeared more shocked than the codefendant. The codefendant identified himself and [Petitioner] in the ATM surveillance recording. The codefendant identified the vest recovered by police as [Petitioner's] and said [Petitioner] wore it during the shooting

The codefendant testified that he thought [Petitioner] panicked and that when another car pulled up, [Petitioner] jumped on the car. The codefendant stated that he climbed on the back of the car in order to "snatch" [Petitioner] off the car and that [Petitioner] got off the car and told the driver to get out. The codefendant saw [Petitioner] and the driver wrestle to gain control over a gun and the codefendant heard gunshots. The codefendant said later, though, that he was focused on the car crash when he heard gunshots. He said that when he looked over, [Petitioner] was on top of the car holding a gun to the driver's head.

The codefendant testified that he ran, climbed on the back of the Corvette, and grabbed the driver's jacket. The codefendant stated that the driver rapidly accelerated and hit the brakes in the middle of the street, at which point the codefendant and [Petitioner] fell off the Corvette and ran away. The codefendant said [Petitioner] told him that the driver shot himself.

- 5 -

The codefendant testified that as he fled, he climbed a fence and saw [Petitioner] throw the gun over the fence before he followed the codefendant. The codefendant said [Petitioner] fell, and the codefendant continued running. The codefendant denied being armed or shooting anyone and said he did not know [Petitioner] was armed. The codefendant said he and [Petitioner] saw one another in jail. The codefendant said [Petitioner] told him that [Petitioner] would "take his charge" and tell the police the codefendant was not involved. The codefendant said that he did not know [Petitioner] was going to pull out a gun at the ATM or what the codefendant would have done if [Petitioner] had successfully gained control of the Corvette.

The codefendant testified that he did not go to the police after the shooting because he believed [Petitioner] was going to tell the police that the codefendant was not involved and that it "wasn't on me" to report [Petitioner] to the police. He said he was testifying because two years had passed and [Petitioner] had not taken responsibility. The codefendant said that he did not have an agreement with the State but acknowledged that he hoped to receive consideration after his testimony.

On cross-examination, the codefendant testified that during his initial police interview, he lied when he denied having any knowledge of the crime. The codefendant stated that he had been charged with murder in perpetration of a robbery, attempted especially aggravated robbery, attempted carjacking, and employing a firearm during the commission of an attempted carjacking. The codefendant said that he wore a gray hooded sweatshirt and black sweatpants the night of the shooting. The codefendant clarified that he and [Petitioner] did not enter McDonald's and that they changed direction to walk toward the ATM. The codefendant stated that he never left the sidewalk and did not approach the car at the ATM.

The codefendant testified that he saw the female victim's car crash, [Petitioner] jump on the Corvette, saw [Petitioner] and the driver fight, and heard gunshots. The codefendant said that he did not see the Corvette's driver with a gun and that the driver did not chase him or [Petitioner] across a parking lot. The codefendant acknowledged that he had a previous theft conviction.

Dr. Miguel Laboy, an expert in forensic pathology, testified that he performed the female victim's autopsy and found a close-range gunshot wound to the victim's left forearm, a fracture to her humerus, and a gunshot

- 6 -

wound to the left side of her chest. He stated that the heart and liver were perforated, an adrenal gland was lacerated, and blood accumulated in the left side of the chest, abdomen, and pericardial sac. He said that he recovered a bullet from the abdomen and that the arm and chest wounds were consistent with the path of one bullet. The victim had abrasions and lacerations to her head, face, right upper arm, and lower extremities, which were consistent with a car crash.

Dr. Laboy testified that the gunpowder residue on the female victim's shirt indicated that the gun was fired at close range. He said that gunshot wounds to the torso or heart would generally allow for momentary movement before a victim became unresponsive. Dr. Laboy concluded that the cause of death was a gunshot wound to the torso and that the manner of death was homicide.

Upon this evidence, [Petitioner] was convicted of first degree premeditated murder, felony murder during the attempt to perpetrate a robbery, attempted especially aggravated robbery, attempted first degree murder, attempted carjacking, and employing a firearm during the attempt to commit a dangerous felony.

*State v. Holmes*, No. W2015-00537-CCA-R3-CD, 2016 WL 929282, at *1-7 (Tenn. Crim. App. Mar. 11, 2016.

*Post-Conviction Hearing*

On January 12, 2017, Petitioner filed a pro se petition seeking post-conviction relief for several complaints of ineffective assistance of counsel. Petitioner was appointed counsel and an amended petition was filed. At the evidentiary hearing, three witnesses, including Petitioner, were called to testify. During his trial, Petitioner had two attorneys aiding his defense. Each attorney testified at the evidentiary hearing. His lead counsel will be referred to as "trial counsel" and the counsel who joined his defense team as the DNA expert will be referred to as "second counsel."

Petitioner testified that his trial counsel represented him from the beginning of 2013 through his trial in 2015. Petitioner explained that he and his trial counsel had "a couple of conversations" and that she did not have a trial strategy in place for his defense. Petitioner recalled that his trial counsel advised him not to testify at trial. In addition, Petitioner stated that his trial counsel failed to suppress the DNA evidence presented by the State. He believed his DNA was taken in violation of his constitutional rights. Petitioner explained that he was unaware that the State had his DNA until a few days

before his trial. Moreover, he wanted his trial counsel to file a motion to suppress the DNA evidence because he believed he was arrested without probable cause and that law enforcement retrieved his DNA because he was arrested. Petitioner conceded that his trial counsel successfully filed a motion to suppress his statement to law enforcement, but Petitioner argued that the same should have been done regarding his DNA evidence.

Additionally, Petitioner testified that there was a juror present for his trial that neither of his attorneys objected to. He stated that the juror should have been excused because there were credibility issues with the juror's ability to be fair.

Petitioner also testified that he believed he was arrested in violation of his Fourth Amendment right because law enforcement did not have a warrant and there was no probable cause to arrest him. Petitioner explained he was "arrested for the purposes of gathering evidence against [him]." Petitioner testified that his trial counsel failed to properly confer with him about his right to representation. He explained that his trial counsel pressured him multiple times to plead guilty. Lastly, Petitioner testified that his trial counsel did not present a cohesive defense strategy for his trial. He argued that but for his representation from both trial counsel and second counsel he would have had a completely different result.

On cross-examination, Petitioner testified that there was not probable cause for his arrest, and he did not know why he was arrested. In response to why law enforcement picked him to be arrested, Petitioner claimed he "ha[d] no idea, [he] really didn't." Further, he explained he was arrested before his mother had reported him as the suspect in the video released to the public. Petitioner conceded that he and trial counsel had "a lot of conversations" regarding Petitioner's case. While he testified that he did not understand what was going on with his trial, Petitioner recalled that his trial counsel successfully suppressed his statement to police because of a *Miranda* violation. However, Petitioner remained adamant that his trial counsel should have challenged the DNA evidence presented against him.

Petitioner's trial counsel also testified at the evidentiary hearing. She stated that she had been an attorney with the Shelby County Public Defender's Office for thirteen years. At the time of Petitioner's case, she had been assigned in the criminal court for about five years and had tried two or three murder cases prior to Petitioner's case. She also testified that she had another counsel aid her in Petitioner's case because second counsel was known in the office as the DNA expert.

Trial counsel testified that she had investigated Petitioner's DNA evidence for any suppression issues. She determined that police had obtained a search warrant after Petitioner was in custody and found no issues with the search warrant or the method used

to collect his DNA. Additionally, trial counsel looked into Petitioner's arrest and could not find any reason to challenge its constitutionality. She did recall that his arrest was "unusual," but she found that he was arrested after the release to the public of the video footage from the ATM machine. To her recollection, Petitioner's mother had seen the video footage on TV and called law enforcement. Petitioner's mother then came to the station to give a statement to police. Trial counsel testified that the quality of the video footage was "very good." However, trial counsel did testify that there was "a gray area as to how [Petitioner's] body arrived [in custody]" and that her notes also indicated that Petitioner had turned himself into authorities.

Trial counsel also addressed the search warrant for Petitioner's DNA and the lack of evidence to suppress it. Trial counsel recited the basis for the DNA search warrant as Crime Stopper tips and confidential sources of information naming Petitioner as one of the two people responsible for the crimes. She explained that law enforcement was trying to obtain DNA from Petitioner to compare it to a sample found on a handgun and item of clothing in evidence. Trial counsel further testified that even without the DNA evidence, the State would have likely succeeded against Petitioner:

| THE STATE: | And let's go even further. Let's say the DNA was suppressed and we're not allowed to get his DNA again. If the case had gone to trial without DNA, do you still think the State would have been—could have been successful given the other evidence? Given the video? Given his mother's identification of him at trial? |
|---|---|
| TRIAL COUNSEL: | Given the balance of evidence, yes, the State could have succeeded at trial. The codefendant testified, identified him. His mother identified him. The video was played. It was very clear. Yes, the State could have succeeded at trial. |

Further, trial counsel addressed her strategy for Petitioner's case. Trial counsel explained that she and Petitioner discussed why he wanted to go to trial. She testified that he wanted to go to trial and her strategy was to "minimize as much as possible" and "to pick apart small pieces, discredit whoever [she] could." She stated that it was difficult to overcome Petitioner's mother's testimony identifying Petitioner on the video from the ATM. Trial counsel believed Petitioner did not think his mother would show up for trial because the State was having a problem finding her.

Trial counsel testified that she and Petitioner had many conversations about his case. She explained that initially, Petitioner would not talk to her in their meetings, but finally they "established some rapport and started talking." She testified that they talked about each witness and what was expected each might say. Further, she stated that she and Petitioner talked about what they could try to take away from the State's theory and any defenses "where [she would] just have to take little pieces here and there."

In addressing Petitioner's claim that she had not objected to a prejudiced juror, trial counsel testified that there were several jurors who said that they had similar experiences within their family to Petitioner's crime but each one of them said that it did not affect the ability to be fair. Trial counsel further stated that she would not have voluntarily left someone on the jury if the person could not be fair. Additionally, trial counsel testified to how she successfully suppressed Petitioner's statement to police. She explained that the sergeant investigating Petitioner's case continued to talk to Petitioner after Petitioner said he was finished talking. She encouraged Petitioner not to testify at trial because if he did, the statement that was suppressed would likely be admissible for impeachment purposes. Trial counsel also noted that she did not believe the State made a negotiated plea offer to Petitioner, but once she went forward with the motion to suppress Petitioner's statement, the State said Petitioner's case was going to trial. Additionally, she explained that if the State had made an offer prior, it would have been for a life sentence for first degree murder.

Lastly, trial counsel testified regarding the mitigation process for Petitioner's sentence. She recalled that except for his lack of a prior record and for his youth, "there really wasn't anything solid to argue as far as mitigation goes[.]" She explained that his grandmother was there for mitigation, but that was all she remembered that the defense could present on Petitioner's behalf.

On cross-examination, trial counsel further explained that it took Petitioner several meetings before he talked to her about the case. She believed that they had established an effective line of communication. She also testified that the only constitutional issue she found in Petitioner's case was the questioning that led to the suppression of Petitioner's statement. She further explained that Petitioner had no alibi and that her strategy was to attack the State's case against him.

Petitioner's second counsel testified that she had been working at the Shelby County Public Defender's Office for twenty-three years. She testified that she was brought on Petitioner's case because there was some DNA evidence presented against him. At the time she represented Petitioner, she had spent five years as division head in the Major Violator Unit and two years with the capital defense team.

- 10 -

In trial preparation regarding the DNA evidence, second counsel testified that she reviewed the evidence to see what had been collected at the crime scene. She looked at the original request for DNA evidence, and she evaluated the DNA report when the defense team received it. Second counsel testified that both she and trial counsel did not file a motion to suppress the DNA evidence because the search warrant was properly issued and executed. She believed the basis for the search warrant was Crime Stoppers tips and confidential informants.

Second counsel testified that the defense's strategy for the DNA evidence was to attack the low percentages it revealed. She explained that there could have been additional defendants walking around with the same DNA as Petitioner and she and trial counsel attacked the DNA evidence with that information. Further, she testified that they cross-examined the State's expert and highlighted the DNA's poor percentages. Second counsel stated that she "thought the DNA evidence was weak." She further concluded that Petitioner's DNA was not the condemning piece of evidence leading to his conviction.

Regarding jury selection, second counsel recalled that there was one juror who had a question as to whether he could be fair. However, after further questioning, he came to the conclusion that he could be fair in Petitioner's trial. She testified that this juror was left on the jury, but ended up being an alternate so he did not actually deliberate on Petitioner's verdict. Additionally, second counsel testified that six jurors had been excused from Petitioner's case. To her recollection, one juror had been excused for a family member being killed recently and the others for having health issues. She also stated that she "would never leave anybody on a jury that says they cannot be fair."

Second counsel testified that she had notes from the first day where an offer from the State was discussed, but that Petitioner rejected that offer. She believed he intended to go to trial, but he had somewhat changed his mind when he found out his mother had been located and would testify. Additionally, second counsel testified that Petitioner's mother talked to him and advised him to take the State's offer, but Petitioner said he still wanted to go forward with a trial.

Second counsel affirmed that the defense strategy was to pick apart the State's witnesses. She testified that there were no alibi witnesses, no self-defense argument, and no other defenses to utilize. Therefore, both attorneys determined that they were going to force the State to make a case against Petitioner.

On cross-examination, second counsel testified that she talked to Petitioner both prior to and after his trial. She explained that those conversations were not confined to

DNA. She recalled talking about sentencing. However, she conceded that trial counsel was doing most of the communicating with Petitioner.

At the conclusion of the evidentiary hearing, Petitioner was recalled to the stand. He testified that he did not turn himself into the police, but that he was arrested in his house. He stated that he was not told why he was being arrested.

| | |
|---|---|
| COUNSEL: | Did they tell you why you were under arrest? |
| PETITIONER: | No, sir. I was understood that I was supposed to come for questioning but I didn't know I was being arrested at the time. I didn't know anything about that. And that—and I think it shows in the arrest report the arrest warrant came the next day after. So I was arrested a whole 24 hours. Here go the arrest warrant right here, it came the day after. So they took DNA from me without reading my rights. They took that DNA and I was arrested. |
| COUNSEL: | Did they take DNA from you right away? |
| PETITIONER: | Yeah, they took DNA. Let me get the time for you. They said they took—the DNA supplement says—let me get the right one. Please bear with me. Yeah, it said Sergeant Tatum prepared the DNA search October 16, 6:17 p.m. And they ain't sign until—the judge signed at 6:45 p.m. But I wasn't—they didn't even present me to my Miranda rights or the arrest warrant didn't come until the next day and it wasn't stamped until the next day for this search warrant for DNA. So they took the DNA before they even have anything about me. |

COUNSEL: So you're saying the search warrant was prepared after they took DNA?

PETITIONER: Yes, sir, according to this right here.

Petitioner testified that he explained to his attorneys all of his concerns with the search warrant for his DNA, but they did not look into the search warrant or find any discrepancies with the date.

Following the conclusion of the evidentiary hearing, the post-conviction court ruled that Petitioner was not entitled to relief on any of his claims of ineffective assistance of counsel. The post-conviction court's findings of fact concluded that Petitioner failed to present credible evidence of deficient performance or prejudice in his claims of ineffective assistance of counsel.

## ANALYSIS

Petitioner appeals the judgment of the post-conviction court denying him relief for his claims of ineffective assistance of counsel. Petitioner argues that his trial counsel's representation fell outside the range of acceptable professional performance for failing to adequately prepare for his trial and for a breakdown in communication between himself and his trial counsel. Further, Petitioner asserts that such deficiencies in his trial counsel's performance were "outcome determinative" for his trial. The State contends that Petitioner has failed to show with any clear and convincing evidence that he was denied effective assistance of counsel. We agree with the State.

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103; *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). The Tennessee Supreme Court has held:

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

- 13 -

*Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); *see Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011); *Frazier v State*, 354 S.W.3d 674, 679 (Tenn. 2010).

A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. T.C.A § 40-30-110(f); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier*, 303 S.W.3d at 679.

A petitioner has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. at 687; see *Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Id*. at 697.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1966) (*citing Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Furthermore, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Our analysis begins with the holding of the post-conviction court, denying Petitioner relief on his claims of ineffective assistance of counsel. In his petition, Petitioner asserts six specific claims of ineffective representation. However, on appeal, Petitioner only offers two general claims for relief: (1) inadequate preparation of his trial

- 14 -

counsel and (2) a breakdown in communication between Petitioner and his trial counsel. The post-conviction court held that Petitioner "failed to establish deficient performance or prejudice" in any of his claims.

*Inadequate Preparation*

Petitioner argues that the representation of both attorneys fell outside the range of competence demanded of attorneys, specifically regarding his preparation for trial. Petitioner argues that the attorneys were inadequately prepared for his case and continued to set the case for trial without completing all investigation efforts. Petitioner asserts that such lack of preparation was deficient representation and such deficiency prejudiced the outcome of his trial. The State contends that Petitioner has failed to show how his attorneys were either deficient in preparation for trial or how any purported deficiencies prejudiced the results of his verdict.

At the evidentiary hearing, Petitioner failed to testify to or put on any proof of inadequate preparation by his trial counsel and second counsel. Petitioner testified to his concern with trial counsel's failure to suppress DNA evidence, failure to investigate constitutional issues of his arrest, failure to object to a juror with bias issues, failure to present a defense, and failure to inform Petitioner about the nature of his proceedings. However, in his brief, Petitioner generally asserts lack of preparation on the part of his attorneys without any specific claims as to how they were unprepared. Additionally, no witness testified at the evidentiary hearing to what the attorneys should have done in trial preparation that they actually failed to do. Instead, Petitioner addressed his specific allegations regarding the DNA evidence, a biased juror, his arrest, his defenses, and the communication between him and his attorneys.

First, Petitioner failed to present any witness or evidence to show that there was a suppression issue with his DNA. Both trial counsel and second counsel investigated how Petitioner's DNA was retrieved by law enforcement, and neither found a valid suppression issue to address. Further, in order to show prejudice for failing to file pretrial motions to suppress evidence, a petitioner must show by clear and convincing evidence that (1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested. *Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436 (Tenn. Crim. App. Sept. 12, 2011), *no perm. app. filed*. In the present case, Petitioner has failed to show either required element. Petitioner's second counsel joined his defense team to specifically address the DNA in his case, and she found that the DNA evidence was weak in comparison to the other evidence. Assessing the proof of the State as a whole, she testified that Petitioner's DNA was not the condemning piece of evidence

- 15 -

in his conviction. Therefore, Petitioner failed to show that the DNA would have been suppressed and that such suppression would have resulted differently in his trial.

Additionally, in connection to the suppression of DNA evidence, Petitioner vaguely asserts that his attorneys should have investigated the circumstances of his arrest because it was in violation of his Fourth Amendment rights and led to law enforcement retrieving Petitioner's DNA. However, Petitioner failed to present any proof to support this allegation. While there is some disagreement to how Petitioner was actually taken into custody, Petitioner did not call any witness to testify or present evidence to show that his arrest was unconstitutional. Evidence to support the allegations of ineffective assistance of counsel must be presented at the evidentiary hearing. Courts cannot speculate as to what evidence might prove deficient performance or prejudice. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. 1990).

Third, Petitioner has failed to show that his trial counsel neglected to present any strategies or defense for his case. At the evidentiary hearing, both trial counsel and second counsel specifically testified regarding the strategies for Petitioner's defense. The State presented strong evidence of guilt at trial, and both attorneys felt that Petitioner's best defense was to pick apart the State's proof. Trial counsel testified that their trial strategy was to "minimize as much as possible" and "to pick apart small pieces, discredit whoever [they] could." Petitioner has offered no evidence as to how trial counsel failed to present a cohesive defense and this Court does not second-guess trial strategy. *Hellard*, 629 S.W.2d at 9. Additionally, at the evidentiary hearing, Petitioner conceded that his trial counsel successfully persuaded the trial court to suppress Petitioner's statement to law enforcement.

Lastly, regarding trial counsel's preparation, Petitioner argues that his trial counsel should have objected to a biased juror left on the jury. Petitioner asserts that this juror said he could not be fair because he had been a victim of a crime. At the evidentiary hearing, both trial counsel and second counsel testified that a biased juror would have been challenged. Second counsel specifically testified that there was one juror who initially believed he would have an issue with being fair, but that this juror changed his mind during voir dire after further questioning. Further, the post-conviction court found that Petitioner had "failed to present any credible evidence that any juror that sat on his case had indicated an inability to be fair" and that the one juror who had voiced some concern "had ultimately been rehabilitated and, more importantly, was an alternate who did not deliberate on the case."

Because Petitioner failed to show any lack of preparation on the part of his trial counsel that would be deemed deficient and/or prejudicial to his defense, he is not entitled to relief on this claim.

*Breakdown of Communication*

Petitioner asserts that his attorneys' representation was ineffective because there was a breakdown in communication between Petitioner and both his attorneys. Petitioner asserts that he did not understand the nature of his proceedings against him and that there were communication problems from the beginning of the representation. The State contends that any communication issues were the fault of Petitioner, and therefore, he is not entitled to relief.

Petitioner testified there were several instances where he did not understand the nature of the proceedings against him and that he remained confused about his case throughout the representation. However, Petitioner failed to present specific instances of communication problems that affected the results of his trial. Additionally, Petitioner conceded to having several conversations with both his trial counsel and his second counsel. Specifically, Petitioner stated at the evidentiary hearing that "[he and trial counsel] always had a couple of conversations" when trial counsel would come to meet with him. Moreover, trial counsel testified that Petitioner refused to talk to her in their initial meetings. Trial counsel recalled that the "first few times [she and Petitioner] met he wouldn't speak to [her], [he would] just get up and leave." She stated that it took "a little while" but that they eventually "got down to what [they] were supposed to do." Petitioner failed to establish deficient performance or prejudice on the part of trial counsel's communication. Therefore, Petitioner is not entitled to relief on this claim.

CONCLUSION

The judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE